In May 1786, John Hague, as well on behalf of himself as of the commonwealth, filed a libel, in the court of admiralty, against the sloop Nancy, Henry Stratton, master, for a breach of the then revenue laws of the state, charging that the said sloop laden with a chariot, or phaeton, and harness, and other articles, came from Philadelphia to James river, in April 1786 ; and that the master failed to make an entry *with the naval officer, until after seizure of the vessel and cargo by the libellant; but secretly landed part of the cargo: wheieby both sloop and cargo became liable to seizure and condemnation.
The answer of Stratton states, that he is a citizen of Virginia and owns the sloop. That the cargo chiefly belonged to persons in Richmond and Manchester ; the residue to himself. That the sloop arrived in Hampton road on the 21st of April, 1786, under a heavy storm, where he cast anchor, and remained about three hours; but finding the storm too severe to continue there, he went up the river; and in weighing anchor, he lost both cable and anchor: and got around at Warrasqueak bay, where he lost another cable and anchor, being all he had. That, on the 23d of April, he went on shore at Lyons’ creek below Hog island ; and there was informed that the naval office at Wil-liamsburg was discontinued. In consequence of which, having no anchor left, he run for Richmond and Manchester as places of delivery ; but, on account of the heaviness of the current, could not get up until the 2d of May, 1786, when the sloop arrived at Warwick ; and, on that day, about an hour by sun in the morning, he despatched the mate to Hampton, to report and make an entry of the sloop and cargo according to law ; who, on the 4th of May, made a report and entry of the vessel and cargo, without fraud or diminution, and secured the duties. That, upon the last named day, about 10 o’clock, the libellant gave him the first notice of his intention to libel. That he has not violated the law ; and had no inducement to do so, as the duties, on his own goods, did not exceed ten shillings.
There was a general replication to the answer ; and, upon the trial of the issue, the jury found for the libellant : but the court, upon the motion of the respondent, set aside the verdict; and awarded a new trial, upon payment of costs, and giving caution, in ^1000, to have the sloop and cargo forthcoming to abide the sentence of the court:
*Upon the second trial, the jury found a special verdict, stating, in substance, that the respondent owned the sloop ; and the persons, mentioned, in the answer, the goods. That the sloop arrived in Hampton road, on the 20th of April, 1786; and, from the violence of the storm, did not ride there more than three or four hours. That, in weighing anchor, she lost both cable and anchor ; and, the storm continuing, she ran up James river, stopping for a short time under Newport’s News, where she landed two passengers, the wind still blowing very hard, and in Warrasqueak bay, she lost another cable and anchor. That the sloop arrived at Warwick on the 2d day of May, 1786, in the morning; and, the master being unwell, immediately despatched the mate to Hampton to enter the vessel and cargo: which he did on the 4th of May about ten o’clock in the morning ; obtained a permit; and secured the duties. That the storm subsided in the night of the 21st of April, 1786 ; whereupon the respondent went on shore at Lyons’ creek, and was there told that the naval office at Williamsburg was discontinued : and, at Broadway, was informed of the appointment of searchers. That the respondent went on shore at Bermuda Hundred ; and that Broadway is a safe port. That the libellant went, on board, at Warwick to search the vessel, on the 2d of May, 1786, about four o’clock in the afternoon ; found the hatches open, where some of the people slept, the sloop appearing to be not more than half laden ; but that that was her condition, when she left Philadelphia. That the libellant then made a seizure, and on the next day sent persons to conduct her to Rockets. That the respondent cleared out from Virginia on the 17th of March, 1786, two months after the office at Williams-burg was discontinued ; and 17 days after the law which discontinued it was published in the Virginia Gazette : that he asked if the office was discontinued; and was told by the officer that there was such a report, but he believed it would not take effect before the first of April, or perhaps the next meeting of the legislature.
*824 *The court, upon the special'verdict, condemned the sloop and cargo as forfeited : and the respondent appealed to the court of appeals.
Por the appellant, it was contended, that the law, upon the verdict, was for the appellant. Por although the strict letter of the statute had not been obsérved, the failure arose from invincible necessity, and the act of God, as no human efforts could have resisted the storm ; nor any other course, than that pursued, have saved the vessel and crew; That every departure from the Tetter of a statute is not an infraction, according to the celebrated case, iñ which it was held, that a law forbidding blood to be shed in the street, did not extend to a surgeon who let it, in order to save the life of his patient. That, if the naval'office at Williamsburg had not been discontinued, the leaving Hainpton road was in the direct course of the voyage : and, although the act of assembly had -been published in the Virginia Gazette, it did not necessarily follow that the master was acquainted with the terms of it, as it is not every man who reads the newspapers; and very few seafaring men, if they had the inclination, would have the opportunity. Besides, as the naval officer' when he left Virginia informed him that the discontinuance was rumour only ; and that, if it'took place at all, it would not be sooner than April, and, perhaps, not before the meeting of the legislature, it was natural enough for him, almost in a state of-shipwreck,-to seek a safer harbour, and resort to the former office for the purpose of making his entry. That, if he proceeded up the river, after learning that the office was actually discontinued, to the port of delivery, it was an act of prudence, as both his anchors had been lost, and he could not have returned to Hampton, without increased' danger, for want Of them : but they could be dispensed with in the voyage up the river. That no attempt to land any of the goods was made ; but the whole were, in convenient time, duly entered, and the duties- all secured. That there was not the slightest evidence of any fraudulent1 ^intention : and the master could, indeed, have had no motive for it, as the duties on his own goods did not exceed ten shillings, which were greatly overbalanced by the loss of his cables and anchors.
On the other side, it was said, that the law was positive; and the departure from Hampton, under a pretence of going to the discontinuéd'office at Williamsburg, was a deliberate infraction of it. That ignorance of k statute is no excuse ; for the doors of the legislative halls are open to every body ; and all the world has an opportunity of knowing what is done there : Besides, this law had been'published, and the-master had heard of the discontinuance before he left Virginia ; but relied upon the information of one, who had no authority to give it. That he might, when undeceived at I/yons’ creek, - have returned to Hampton road, and made the entry: and his proceeding up the river, without doing so, marked a design to evade the duties. That the sending the mate'at' last to make ah entry, was''only to escape the consequences of his illegal conduct: for, although it might be true, that the step was taken an hour or two before the seizure, it was plainly dictated by the hazard he run, as he had been informed at Broadway of the appointmeut of searchers, and probably dreaded that he would be visited by some of them. That his frequent stoppings up the river, looked as if he had been seeking for opportunities to dispose of the goods ; and notwithstanding there was no proof of any such disposal, it was far from being certain, that none were landed. That the whole complexion of the case was fraudulent, and did not entitle the respondent to any favour.
The court, however, was of opinion that the-departure from Hampton, in the first instance, was necessary; and that the failure, to return there, was justifiable in the master, as, for want of his anchors, it could not have been done- in safety. That proceeding to the port of delivery, afterwards, was the most prudent course, as it ex--poséd the ship and cargo to less *hazard from tempest; and, as the mate was despatched immediately, on her arrival 'at Warwick, to make the entry ; which service was faithfully performed without loss of time, the duties all secured, and the permit obtained, the objects of the law-were all satisfied ; and, therefore, that the proceeds of the sale ought to be restored ; but that there was probable cause of seizure ; and the entry made in the order book, was as follows :
“This day came the parties, by their counsel, and,the court having maturely considered the transcript of the record, and the arguments of the counsel, are of opinion that the said sentence is erroneous. Therefore it is decreed and ordered, that the same be reversed and annulled; and that the appellee pay to the appellant his costs by him expended in the prosecution of his appeal aforesáid here. And the court proceeding to give such sentence as the said court of admiralty ought to have given, do decree and order that the libel be dismissed ; and that the sum of fifty-nine pounds one shilling, the amount of the sales of the vessel and cargo b'e restored to the respective owners, retaining thereout the duties on the said cargo, if not already • paid. And this court do order it to be certified, as their opinion, that there Was probable cause of seizure. Which is ordered to be certified to the district court, directed, by law, to be holden at Williamsburg.”